**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **Kenneth A. Horne,** | § | |
| | § | |
| **Plaintiff,** | § | **C.A. No. 11-cv-00063** |
| | § | |
| **v.** | § | |
| | § | |
| **Dickinson Independent School District,** | § | |
| | § | |
| **Defendant.** | § | **(JURY TRIAL DEMANDED)** |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,

*/s/ Katrina S. Patrick*

_____

Katrina S. Patrick
Attorney-in-Charge
Federal Bar No. 22038
530 Lovett Street
Houston, Texas 77006
Telephone: (713) 796-8218
Facsimile: (713) 533-9607

**ATTORNEY FOR PLAINTIFF**
**KENNETH A. HORNE**

# TABLE OF CONTENTS

I.      Nature And Stage Of Proceeding……………………………………….....   1-2

II.     Facts Of The Case …………………………………………………………   2-26

        1.  Show Me Who You Really Are Why Don't You………………………….  2

        2.  Meet Kenny……………………………………………………………..  2-7

        3.  Horne's start at DISD cloak in patience and protection…………………  7-9

        4.  "The only disability in life is a bad attitude."  Scott Hamilton…………..   9-12

        5.  Offensive Slurs By Management………………………………………..  12

        6.  Behavior Learned……………………………………………………….  12-13

        7.  Wrath of Grace………………………………………………………….  13-14

        8.  DISD's Ruse…………………………………………………………….  14-16

        9.  What's good for the goose is evidently NOT good for the gander………...  16-24

        10. Termination Day………………………………………………………..  24-26

III.    Statement of the Issues and Standard of Review ……………………………..  26

IV.     Arguments and Authorities …………………………………………………  26-40

        1.  DISD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
        DISABILITY DISCRIMINATION CLAIMS…………………………………  26-33

        2.  DISD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
        HOSTILE WORK ENVIRONMENT DISABILITY DISCRIMINATION
        CLAIMS……………………………………………………………………  33-38

        3.  DISD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
        FAILURE TO ACCOMMODATE CLAIM…………………………………  38-40

V. Conclusion ……………………………………………………………………  40

ii

# EXHIBIT TABLE

Exhibit A – Plaintiff's Charge of Discrimination

Exhibit B – Positive Recommendation from EEOC

Exhibit C – Deposition of Kenneth Horne

Exhibit D – Louise Horne's Affidavit

Exhibit E – DISD Maintenance Job Description

Exhibit F – Letter from Defendant's counsel to EEOC

Exhibit G -  Audio recording transcript

Deposition of James "Jimmy" S. Anderson

Deposition of Lowell David "Dave" Grace

Deposition of Jan Stutts

Deposition of Susan Wilcox

Katrina Patrick's Affidavit

# TABLE OF AUTHORITIES

<u>CASES</u>

*Aldrup v. Caldera,* 274 F.3d 282, 287 (5th Cir.2001)…………………………   33

*Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)…………………………..   27

*Appel v. Inspire Pharms., Inc*., 428 Fed. Appx. 279, 284 (5th Cir. Tex. 2011)…...  8

*Avina v. Dallas ISD*, 1999 U.S. Dist. LEXIS 6946 at *13 (5th Cir. April 30, 1999). 31

*Avina v. Dallas ISD*, 1999 U.S. Dist. LEXIS 6946 at *14 (5th Cir. April 30, 1999). 33

*Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 706 (5th Cir.1997)………..  38

*Bragdon v. Abbott,* 524 U.S. 624 (1998)……………………………………………   29

*Celestine v. Petroleous de Venez,* 266 F.3d 343, 353 (5th Cir. 2001)……………… 34

*Cutrera v. Bd. Of Supervisors of La. State Univ.,* 429 F.3d 108, 112 (5th Cir.2005) 38

*Deas v. River West, L.P., 152* [*14] *F.3d 471, 476, n.9 (5th Cir. 1998),* cert. filed, *67 U.S.L.W. 3394*, No. 98-916 (December 2, 1998), and *67 U.S.L.W. 3438*, No. 98-1057 (December 30, 1998)……………………………………………………………………   33

*Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.,* 242 F.3d 610, 614 (5th Cir.2001)………………………………………………………………………………   29

*Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995)………………   29

*Fowler v. Carrolton Pub. Library,* 799 F.2d 976, 984 (5th Cir. 1986)…………..   28

*Garner v. Chevron Phillips Chemical Co., L.P., et al.,* H-10-138 pg 10 (S.D. Tex. 2011)……………………………………………………………………………………   29

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)………………………………   35

*McInnis v. Alamo Cmty. Coll. Dist.,* 207 F.3d 276, 279 (5th Cir. 2000)…………   28

*Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097 (2000)…………..   27

iv

*Rodriguez v. ConAgra Grocery Prods. Co.,* 436 F.3d 468, 475 (5th Cir.2006)….. 33

*Rogers v. Int'l Marine Terminals,* 87 F.3d 755, 758 (5th Cir.1996)…………….. 29

*School Board of Nassau County, Fla. V. Airline,* 480 U.S. 273 (1987)………….. 31

*Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1120 (5th Cir. 1998)……….. 31

*Taylor v. Phoenixville School Dist.*, 174 F.3d 142, 1999 U.S. App. LEXIS 6067.. 39

*Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir.

1996)…………………………………………………………………………… 39

*Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996)………….. 38

*Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 185 (2002)………….. 29

*Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir.1999)…………………………. 34

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| Kenneth A. Horne, | § | |
| | § | |
| Plaintiff, | § | C.A. No. 11-cv-00063 |
| | § | |
| v. | § | |
| | § | |
| Dickinson Independent School District, | § | |
| | § | |
| Defendant. | § | (JURY TRIAL DEMANDED) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE GREGG COSTA:

COMES NOW Plaintiff, KENNETH A. HORNE, and files this Response to Defendant's Motion for Summary Judgment ("Motion").

## I.   Nature And Stage Of Proceeding

**"A true [employer] knows your weaknesses but shows you your strengths; feels your fears but fortifies your faith; sees your anxieties but frees your spirit; recognizes your <u>disabilities</u> but emphasizes your possibilities." - William Arthur Ward**

This case shines a very bright light on the illegal myths and stereotypes perpetuated by employers against qualified, disabled employees. DISD subjected the Plaintiff—an eager to please, young, Anglo male with a learning disability—to incredibly mean stereotypes and workplace limitations solely because of his medical condition. In the end and based on DISD's targeted conduct, Plaintiff lost his long-standing job, his income and his dignity.

Plaintiff filed his only ever charge with the EEOC on April 3, 2007. *Exhibit A.* The EEOC issued a determination letter stating Plaintiff's claims were "based on credible evidence." *Exhibit B, page 1, para 2.* The EEOC attempted to resolve this matter via conciliatory efforts,

1

which failed. *Exhibit B, page 2, para 3*.   As a result, Plaintiff was compelled to initiate the instant lawsuit to redress DISD's egregious violations of his employment rights.

## II. Facts Of The Case

### Show Me Who You Really Are Why Don't You

On October 6, 2006, Kenneth Horne did what he and many other working class folks do every workday.  He got out of bed, got dressed, and drove himself to work.  In Horne's case, he drove to DISD for another day's work. Horne thought this Friday was going to be like any other day. But he was wrong! This day was different in deed.

Immediate Supervisor Lowell David "Dave" Grace and Second-line Supervisor James "Jimmy" Anderson met with Horne.  They informed Horne that his time-honored employment at DISD was being terminated effective October 20, 2006. Both Grace and Anderson were decision-makers in Horne's termination at DISD.  *Grace pg 86: 10-17*. The two superiors further warned Horne not to tell anyone he was terminated.  *Exhibit A, par 2*.  Who would have the audacity to tell an adult male not to tell anyone he was fired?  The answers: (1) persons who had knowledge of *this* particular adult's intelligence level and (2) persons who intended on taking full advantage of *this* particular adult.

### Meet Kenny

Kenneth "Kenny" Horne was born to Jack and Louise Horne on July 23, 1969.  *Exhibit D para 3*.  These proud parents soon realized that a young Kenny was "different" – special but different.  *Exhibit D para 4*. Kenny was not like the Horne's older son, Jackie.  *Exhibit D para 4*. For instance, Kenny did not speak more than three words at a time during his early childhood years.  *Exhibit D para 6*. Jackie was very active; Kenny was usually quiet.  *Exhibit D para 5*.

2

Jackie initiated play time with other children; Kenny would stand back and watch. *Exhibit D para 5*. In elementary school, Kenny's teachers had honest dialogue with the Hornes. *Exhibit D para 11*. Kenny simply did not perform on the same level - academically, socially, or otherwise - as his young peers or his brother during the same stages in life. *Exhibit D para 7*. Consequently, Kenny had to repeat the first grade. *Exhibit D para 8*. By the third grade, Kenny still did not perform satisfactorily academically and answers were needed. *Exhibit D 9*. Kenny was a third-grader learning at a first grade level. *Wilcox pg 36:4-5*. A young Kenny underwent a battery of tests and evaluations both by DISD[1] and University of Texas Medical Branch at Galveston. *Exhibit D para 10 thru 12*. The Hornes learned a number of important facts: one side of Kenny's brain did not fully develop at birth, Kenny had a hearing impairment and Kenny showed signs of autism.[2] *Exhibit D para 10*. Based thereon, Kenny was removed from regular classes and put into special education classes, where he would remain until he graduated from high school. *Exhibit D para 9*. Kenny was evaluated every school year and every year it was determined that Kenny should take special education courses. *Exhibit D para 12*. Importantly and throughout, Kenny was the product of DISD education. *Exhibit D para 12*. All special education children graduated ceremoniously with the children from the regular high school in DISD. *Exhibit D para 12*. However, Kenny took special education classes for all studies except for vocational classes. *Exhibit D para 12*. His transcript shows that Kenny took special education courses. *Exhibit D para 12 and Wilcox Exhibit 3*. After high school, Kenny enrolled in reading and math courses at College of the Mainland in Texas City, Texas to improve his learning. *Exhibit D para 16*. Kenny

---

[1] As required by the State of Texas. *Wilcox pg 34:3-24*.
[2] Horne was evaluated in the 1970s during a time when learning disabilities were not well researched and openly discussed. *Exhibit D para 11*. Many say the history of autism is still being written.

<u>can</u> read and write but not like his peers, which is why his parents help him with important matters. Unfortunately, Kenny could not do so well enough to pass those college classes. *Exhibit D para 16.* It is untrue that Kenny went to college from 1988 to 1992. *Exhibit D para 16.* Kenny was mistaken in his deposition. *Exhibit D para 16.* He attended college for approximately 1.5 years with no success and ended his quest at a college education. *Exhibit D para 16.*

Bing.com defines a learning condition as a condition that either prevents or significantly hinders somebody from learning basic skills or information at the same rate as most people of the same age.

According to Medicinenet.com:

- A learning disability can cause a person to have trouble learning and using certain skills. The skills most often affected are: reading, writing, listening, speaking, reasoning, and doing math.
- Researchers think that learning disabilities are caused by differences in how a person's brain works and how it processes information.
- There is no "cure" for learning disabilities. They are life-long.

Kenny's world is indeed a dichotomy. On the one hand, he has participated in the Special Olympics in the 7th and 8th grade. *Exhibit D para 13.* On the other, he was not successful in his quest for a college education. *Exhibit D para 16.* On the one hand, Kenny has a driver's license and CDL license; but so, too, did it take him several tries before he passed said tests. *Exhibit D para 14 and Horne 20:18-19 and 21:7-9.* Kenny worked for the family's air conditioning business for years; unlike their other employees, Kenny performed very **basic** installation and was well supervised. *Exhibit D para 18.*

To this day, Kenny has never developed much of a vocabulary unlike his peers, which is why his parents help him with important matters. *Exhibit D para 6.* To this day, Kenny has

4

trouble understanding directions unlike his peers, unless those instructions are repeated to Kenny or Kenny repeats those instructions to the instructor. *Exhibit D para 20.* To this day, Kenny processes and learns differently from others. *Exhibit D para 19.* Kenny has an IQ of 72, which is borderline mental retardation. *Exhibit D, para 17.* The question becomes not can Kenny read, listen, reason and understand - but rather to what capacity.

Not surprising, DISD's motion shows still a lack of understanding for Kenny's plight. Kenny <u>can</u> perform. He cannot do so like most people his age absent routine, patience, support, and habit. *Exhibit D para 26.* DISD's motion highlights the ***end*** result of what Kenny can do. It fails miserably to underscore the ***effort and degree*** it takes for Kenny to perform – unlike other persons his age.

Kenny <u>can</u> pay certain basic bills but his mother is there to ensure still that there are no consequential errors. *Exhibit D para 21.* Kenny's parents take the lead in his doing what most adults can do on their own e.g., filing for unemployment benefits; obtaining new health insurance after employment ends; reviewing, understanding and approving oft-complicated healthcare invoices; completing job applications; and more. *Exhibit D para 21.*

Kenny <u>can</u> hunt and fish. *Exhibit D para 26.* Animals can hunt and fish. His dad taught him how over a long period of time and still accompanies him often. *Exhibit D para 26.* For all those years, Jack Horne stood by Kenny teaching him. *Exhibit D para 26.* Kenny's parents made sure he attended safety classes for boating and guns. *Exhibit D para 26.* Kenny will abide by the rules. *Exhibit D para 26.* Kenny will do exactly what he is told. *Exhibit D para 26.* Kenny is a creature of habit. *Exhibit D para 26.* Kenny has a routine that he does not stray from, which is why he can safely boat, hunt and fish. *Exhibit D para 26.*

5

Kenny <u>can</u> live alone -- now. *Exhibit D para 21.* He wanted to leave his parents' residence and live independently at age thirty-one (31) over his mother's strong objection. *Exhibit D para 21.* Nevertheless, his parents are ever present. *Exhibit D para 21.* Unlike Jackie who left the family home at 18 years old and truly lives independent of his parents, Kenny's parents still ensure that he is functioning satisfactorily in his own residence. *Exhibit D para 21 and Horne 8:16 through 9:7.*

Kenny <u>can</u> use the computer. *Exhibit D para 27.* But so did the Hornes' grandson at age 6. *Exhibit D para 27.* Kenny uses it for routine things. *Exhibit D para 27.* He is not a technology wizard. *Exhibit D para 27.* In fact, Kenny has had the same cell phone for 8 years. *Exhibit D para 27.* He does not like change. *Exhibit D 27.* He does not adapt to upgrades in technology. *Exhibit D para 27.* His phone is basic, which he likes. *Exhibit D para 27.*

None of the aforementioned requires the same amount of mental acuity needed to listen, process and apply work or legal or business or important instructions. Instead, they are routine tasks that do not require much mental exertion. Instead, they are oft-times admirably performed by children all across the world. The question is not what Kenny can do; the questions are: how much of a challenge is it for Kenny to perform, to what degree can he perform and to what capacity does he understand especially in comparison to others his age.

And you know what else? Kenny <u>can</u> work. Some work with accommodations. So long as the environment is free from name-calling, chock full of respect, and packed with patience. According to the one person who has known Kenny his entire life and who has taken this special journey with him, "In my opinion, Kenny does not have the full realization of his inabilities but I

know them. We do not bring up his inabilities with him. We leave him to his beliefs.  This is our

norm and has been for 42 years." *Exhibit D para 28.*

## Horne's start at DISD cloaked in patience and protection

Horne began his employment with DISD on or about September 3, 1996. *Horne pg*

*13:10-13.*  Maintenance Supervisor Cecil Henry hired Horne fully aware of his learning disability.

*Stutts pg 38:13-19.*  Henry told Grace, at Horne's interview in 1996, that Horne had a learning

disability. *Horne pg 83:19 through pg 84:4.* In fact, Horne's personnel records noted that he was

hired pursuant to the ADA[3].  *Stutts pg 40:12-19.*  Importantly, Horne was initially hired to work

in the laundry department at night. *Horne pg 92:15 through pg 93:1 and Stutts pg 15:9-17.* He

was to then, and did so right up until his discharge, clean the uniforms of DISD students

particularly the athletes from August through February – sports season. *Anderson pg 53:24*

*through pg 54:4 and Exhibit C.*

Horne's job duties began to grow to include grounds maintenance.  *Stutts pg 15:9-17.* At

some later point, Horne was the only employee who performed both laundry duties <u>and</u> grounds

maintenance duties.  *Stutts pg 15:18-22.*  Notably for ADA purposes, Horne's job description --

as produced by DISD -- does <u>not</u> show that he was hired to drive DISD vehicles.  *Exhibit E, pg*

*1, Major Responsibilities & Duties.* Too, the job description specifically does not <u>state</u> that Horne

would use a DISD vehicle to perform the essential functions of his job.  *Exhibit E, pg 2,*

*Equipment Used.* Contrary to DISD's assertions, Horne did **<u>not</u>** admit that driving was an

"essential" duty. *Dkt #22, page 4.*  The law is very clear that a duty is not "essential" per the ADA

merely because it is an assignment.  Great weight is given to a job description; "if an employer has

---

[3] Stutts, who worked as a special education aide and a secretary for special education, saw a
document in Horne's work file referencing Horne's hire pursuant to ADA. Stutts pg 14:12-19 and

prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Appel v. Inspire Pharms., Inc.*, 428 Fed. Appx. 279, 284 (5th Cir. Tex. 2011).

Cecil Henry worked at DISD until his retirement in 2000. He was patient with everybody. *Stutts pg 41:19-21.* Henry would tell Grace, Horne's immediate supervisor, "Well, we'll just have to always try to explain things to Ken and work with him and try to make sure he understands what to do." *Grace pg 34:19-23.*

When Henry retired, James "Jimmy" Anderson replaced him. *Anderson pg 24: 2-3.* Anderson admitted to Kenny, the Hornes and Susan Wilcox (family representative) understanding "Kenny's circumstance." *Exhibit G.*

Lowell David "Dave" Grace began his employment with DISD in 1991 as a grounds leader. *Grace pg 14:11-13.* Grace is a tall, imposing fellow (about 6'2), who is more than 20 years Horne's senior. *Grace pg 99: 11-18.* He resigned in 1993 only to return again in July of 1994. *Grace pg 11:5-11.* He voluntarily resigned in January of 2008 as a Grounds Supervisor and was never disciplined throughout. *Grace pg 17:1-12* and pg *152:15-16.* Grace admits to having learned that Horne was a special education student at DISD from Jan Stutts during her employment at DISD. *Grace pg 84:5-10.* Stutts resigned in 2003. *Stutts pg 6:21* thru *pg 7:1.* Horne also told Grace in 1998, "I told him I was in special classes that I took and I had learning disability and I was slow at catching on to things." *Horne pg 80:2-10.* Grace crudely responded, "Yeah, I know" and turned and walked off. *Horne pg 85:2-8.*

Jan Louise Stutts, born on September 5, 1941, began her employment at DISD in August

---

pg 80:1-20. Cecil Henry also told Stutts that Horne was hired under ADA. *Stutts pg 79:13-14.*

of 1980 or 1981.[4] *Stutts pg 6:16-20* and *pg 44:3-4*.  She retired in May of 2003. *Stutts pg 6:21*

thru *pg 7:1*.  Anderson supervised Stutts right up until she voluntarily ended her well-established

career at DISD. *Stutts pg 7:19-21*. To this day, Anderson considers Stutts to have been a "good

employee." *Anderson pg 27: 24-25*.  Before Anderson, Henry supervised Stutts.  *Stutts pg 9:6-

11*.  Under both men, Stutts was the secretary to the maintenance supervisor. *Stutts pg 8:18-20*

and *pg 9:9-11*. As such, Stutts was responsible for getting work orders out to maintenance staff

including Horne, among other things. *Stutts pg 9:12-20*. Stutts worked in a space "just right

outside" of Anderson's office. *Stutts pg 10:8-9*.  In fact, Stutts could see inside Anderson's office,

which was encased in glass.  *Stutts pg 10:9-13* and *19-22*.  Too, she could hear the goings-on

inside Anderson's office "if they talked real loud."  *Stutts pg 10:19-22*.

### "The only disability in life is a bad attitude." Scott Hamilton

After Henry retired, things changed drastically for Horne at work.  Again, Anderson

replaced Henry. And Grace's frustrations with Horne became more and more evident.  *Stutts pg

28:19 through pg 29: 4*.  Admittedly, Grace did not supervise any other persons with a physical

or mental disability.  *Grace pg 138: 5-10*.  Admittedly, Grace did not receive any training at

DISD concerning ADA.  *Grace pg 185: 24 through pg 186:5*.  It should also be noted that Horne

received work instructions from Anderson, Grace and Grounds Assistant Gary Botello, which was

a source of confusion for Horne when these three men's assignments conflicted.  *Grace pg

138:20* through *139:5* and *Grace pg 150:8-22* and *Exhibit C*.  Horne does not function well when

you give him one assignment and change the assignment midway.

Grounds workers and managers including Horne, Anderson and Grace used two-way

---

[4] Early in her career at DISD, Stutts was a special education aide and a secretary at the
administration building for special education. *Stutts pg 14:12-19*.  She met Kenneth Horne there.

9

radios to carry out their duties. *Stutts pg 11:8-24* and *Grace pg 58:3-25*. As such, when one person spoke using said radio all other employees were able to hear. *Stutts pg 12:5-9*. The intolerance of Horne was broadcast for all to hear.

Stutts witnessed Grace and Horne's peers make offensive remarks to and about Horne on several occasions.

"He—he didn't do this just **one** time…" but Grace would become "very upset[5], almost yelling" because he was "tired of [Horne] repeating everything he says to him." *Stutts pg 16:2-20 (emphasis added)*. Stutts responded back to Grace "I tell him, Hold on a minute. I said, You're upset because Kenny repeats back what is being told to him. And Kenny did this even on the radio. And, Yes, and I'm tired of it. And I said, You have to understand something. Kenny was taught to do this at a very young age and has done this all his life, and will probably continue doing it, because he needs a clear understanding of what is being asked of him. **Well, I don't care, he said. I'm just tired of hearing it [said Grace]."** *Stutts pg 16:10* through *pg 17:7(emphasis added)*. Equally important, Stutts heard Grace tell Anderson "essentially the same thing." *Stutts pg 17:11-17*. Anderson had knowledge.

Stutts and presumably all others including Anderson would hear, over the two-way radio, Grace "sigh, exasperated sigh[s]" at having Horne repeat work instructions back to Grace for clarification. *Stutts pg 19:11-22*. Too, Grace could be heard refusing to repeat work instructions back to Horne or refusing to allow Horne to repeat work instructions back to him. *Stutts pg 19:18* through *pg 20:5*. Grace could be heard snapping back at Horne, "I've already told you

---

[5] Grace has been pretty vocal and demonstrative about his displeasure in working with Horne. His statements in his deposition, to Stutts, to Henry, to Anderson and in written memorandums se very strong language. Imagine how Grace expressed himself to Horne.

what to do." *Stutts pg 19:18-22*. Stutts never heard Grace take this same, crass position with his other subordinates -- only Horne. *Stutts pg 20:16-19*. Anderson had knowledge.

Now, Grace claims that Horne never asked him to repeat back work instructions. *Grace pg 73:11-14*. Too, Grace claims that he was never frustrated that Horne had to repeat back work instructions to him. *Grace pg 74: 24* through *pg 75: 2*. A jury is fee not to believe Grace. On the other hand, Grace admits to repeating instructions back to his other subordinates -- without frustration! *Grace pg 155:10-18*.

Stutts also heard Grace tell Anderson that he wanted to get rid of Horne. *Stutts pg 22:19 through pg 23:8*. Grace, too, made clear to Anderson that he was tired of "having to tell [Horne] what to do and then [Horne] telling [Grace] back what [Grace] said." *Stutts pg 23:9-16*. Anderson had knowledge.

Stutts advised Grace <u>and</u> Anderson on how to effectively communicate with Horne – repeat instructions or allow the instructions to be repeated. *Stutts pg 33:6 through pg 34:7 and 19*. Anderson had knowledge. Stutts also recalled that Horne's need to repeat work assignments took a mere minute or two. *Stutts pg 37:12-16*. "[Grace] didn't have to keep – he didn't have to keep telling [Horne.]" *Stutts pg 37:17-21*. "It was usually just one time." *Stutts pg 37:22-25*. This was a non-burdensome, simple accommodation.

Grace claims that he would provide Horne written instructions. *Grace pg 71: 16-19*. This is simply untrue. Of all of the disciplinary actions and memorandums Grace authored or was involved in concerning Horne, Grace admits to <u>not</u> reducing the work assignments to writing on most every occasion. *Grace pg 103:1-3 and 17-19; Grace pg 106: 12-18; Grace pg 109:18 through pg 110:3; Grace pg 113:2-11; Grace pg 127:4-6; Grace pg 142: 7-18; Grace pg 145:8-*

11

*13* ("I don't remember.") and *Grace pg 149:18-22*.   This was a non-burdensome, simple accommodation.

Horne was also given more assignments than his peers – none of whom had learning disorders. *Stutts pg 43:11-15*.  Horne "has a standing laundry duty, in addition to the grounds duties, in addition to driving the box truck duties, where none of the other ones did that." *Stutts pg 43:11-24*.  Ken was also given undesirable assignments such as cleaning toilets. *Exhibit C and Anderson pg 55:6-12*.  Horne's other grounds peers did not have to clean DISD toilets. *Grace pg 152:25 through pg 153:5*.  DISD employed janitors/custodians.  *Grace pg 153:6-7*.  Horne and Ronald Jeanlewis[6] were assigned to laundry. *Exhibit C*, *Stutts pg 72:12-20* and *Grace pg 153:11-13*.

### Offensive Slurs By Management

Grace also openly called Horne "stupid" at the workplace. *Stutts pg 39:24 through pg 40:6*. When interviewed by the EEOC many years ago[7], Stutts said that she witnessed "**plenty** of name calling" some of which occurred in front of Grace.  *Exhibit B, pg 1, para 2(emphasis added)*. Stutts witnessed Grace call Horne "that stupid boy" or "that stupid kid." *Exhibit B, pg 1, para 2*.

### Behavior Learned

Mistreating Horne was not restricted to DISD management.  Horne's co-workers chimed in and why not?  Devaluing Horne was a learned and acceptable behavior.  DISD grounds workers would call Horne "Forrest Gump[8]" a "**few** times," which she reported to Anderson.

---

[6] Mr. Johnlewis was a head custodian at DISD.  *Grace 194:6-8.*
[7] Horne did not retain an attorney during the EEOC's 43-month long investigation into his claims.
[8] "Forrest Gump" is a 1994 American film that depicts several decades in the life of Forrest Gump, a below average intelligence, naïve and slow-witted man.

*Stutts pg 20:20-22 and pg 21:10-11 (emphasis added).* For instance, Corpus Esparza – a grounds employee - called Horne "Forrest Gump" before Stutts retired and several other employees erupted into laugher. *Stutts pg 25:2-18.* Esparza humiliated Horne **again** by calling him "Forrest Gump" at a 2005 DISD Christmas party where Grace was present. *Horne pg 190:17 through pg 191:9.* Stutts also heard Gary Botello[9] – yet **another** grounds employee - refer to Horne as "Forrest Gump." *Stutts pg 25:19 through pg 26:1 and the correction sheet.*

Importantly, Stutts reported the workers' offensive remarks to Anderson when the degradation "got very – very bad[10]." *Stutts pg 21:10-15.* Stutts told Anderson "I didn't like what was happening, that I felt like Dave [Grace] and maybe some of the other men under Dave [Grace] were setting Kenny up for failure." *Stutts pg 21:16-21.* Anderson did absolutely nothing to remediate the workplace situation.

## The Wrath of Grace

Again, Grace exhibited no patience with Horne. He made that very clear during his deposition. "….I did get **mad**." *Grace pg 34:12.//* On a separate occasion, "And I got a little **mad** at him, and I said, 'Ken, this is how you do it.'" *Grace pg 39:4.//* Grace said to Henry, "There are **very few things that he can do**. I feel that we are carrying him." *Grace pg 40:8-9.* //Grace opined in his deposition that Horne "didn't use **common sense**." *Grace pg 35: 2.//* Grace to Horne, "I told him that he should have done this right when I told him, he should have done it a long time ago, that he didn't need to go back and get any tools because it was a very **simple** job that didn't require any **special** tools." *Grace pg 39:10-14.//* Grace to Anderson "Dave [Grace]

---

[9] Gary Botello was a grounds assistant of sorts. When Grace was not present, Botello gave out assignments. *Stutts pg 33:1-3 and Grace pg 138:20 through 139:5.*

[10] Again, Stutts resigned in 2003. By 2003, the ridicule of others towards Horne had reached very concerning levels. Poor Horne; he would have to endure it for 3 more years.

13

feels Ken should be relocated to another department.  Possibly a job with simpler tasks." *Grace pg 56:23 through pg 57:4.*  Grace admits to **not** telling Anderson that any other subordinate should be relocated out of his department; Just Horne!  *Grace pg 142:3-6.*//Grace, in his deposition, said "[Horne] needed to work in a place where he could just kind of do the same thing over and over again." *Grace pg 57: 9-10.*//Grace admits to being angry at Horne on May 2, 2003. *Grace pg 128: 24 through 129:1.* Grace admits to **not** having these same feelings towards Horne towards any other DISD employee.  *Grace pg 109:1-8.*//Grace said to Henry, "He can be replaced in the grounds crew by a mediocre employee and much more work could get done." *Grace 41:17-19.*  As a delicious footnote, the person who replaced Horne had an attendance problem that resulted in his being terminated.  *Grace pg 184:24 through pg 185:2 and Anderson pg 171:3-19.*  You cannot get any production, let alone "mediocre" production, from someone who fails to show up for work! Regular attendance is an essential function of a job. *Carmona v. Southwest Airlines Co.,* 604 F.3d 848, 859 (5th Cir.2010). Anderson had knowledge.

### DISD's Ruse

The indisputable truth is that Grace wanted Horne gone from his department.  Grace admits that "All of us make mistakes or misunderstand instructions from time to time." *Grace exhibit 3, pg 2, last paragraph.*  An ADA infringement occurred when Grace and Anderson failed miserably to treat all similar mistakes and all similar misunderstandings equally.  Grace and Anderson documented Horne's alleged mistakes. Grace and Anderson failed to document Horne's peers' mistakes.  That is unlawful.

### 1.      Accidents and "Near Misses"

First, Horne readily accepts responsibility for some of the things he was disciplined for.  But,

there are some events which he should not have been disciplined for.  And for those infractions committed by Horne, his peers should have been treated uniformly. Too, Horne should not have been held responsible for acts he did not commit.

There was no DISD policy that stated that after a certain number of vehicular accidents the employee should be disciplined.  *Grace pg 149:10-14.* DISD made up disciplinary rules as they went along to Horne's detriment and no one else's.

Horne had 3 vehicular accidents in his 10-years working at DISD.  However, a fair look at his peers' accident and performance history discussed later herein will reveal that Horne was singled out for discipline and termination unlike his peers.

On June 5, 2001, Horne had vehicular accident #1.  *Grace exhibit 4.* Admit.

On June 22, 2006, Horne had vehicular accident #2 ~ some 5 years later.  He struck a DISD trailer being pulled behind another truck.  *Grace exhibit 9.*   Admit.

On August 2, 2006, DISD claims that Horne almost had an accident in a DISD vehicle. *Grace exhibit 10.*  The truth is that Horne himself was self-correcting the vehicle at the same time that Anderson and another employee noticed the vehicle start to jack-knife.  *Horne pg 150:23 through pg151: 4.*

On August 2, 2006,   Horne had vehicular accident #3. Admit.  Horne backed into another DISD vehicle. *Grace exhibit 10.*  At this time, Anderson decided that Horne should no longer drive a truck with a trailer.  *Grace exhibit 10.*  Importantly, there was enough work at DISD to keep Horne busy on a full time basis from August 2, 2006 until his termination effective October 20, 2006.  This means that driving trucks was not an essential part of Horne's job duties.  This means that removing Horne from said duties did not cause a hardship on DISD especially when all

of Horne's grounds peers drove for DISD.  Grace typically supervised 13-14 grounds workers and 11-12 summer helpers.  *Grace pg 22: 23 through pg 23: 8*.  This means that DISD failed to accommodate Horne in this way though they very easily could have.  Moreover, Horne did not have an accident <u>after</u> August 2, 2006. This simple fix worked!

Interestingly, DISD discharged Horne on October 6, 2006 allegedly because of "safety issues" tied to his having "vehicle accidents."  *Grace pg 87:14-22*.  Yet, Grace and Anderson allowed this "dangerous" employee to continue to drive DISD vehicles with no trailers.  *Grace pg 88:224 through pg 89:3*. Did they really view Horne as a danger?  Or was he a burden?

Grace admits that he did not keep record of all "near-miss" accidents of his subordinates.  *Grace pg 192:23 through 193:2*.  Anderson admits that he did not always write-up an employee with a "near-miss." *Anderson pg 40:12-3*.  Anderson even admitted that he did not always write-up an employee who had an **actual** vehicular accident; he stated: "depending on the severity." *Anderson pg 40: 4-12 (emphasis added)*. But they did so with Horne.

Again, when Grace disciplined Horne his animus towards Horne's intelligence challenges were evident and directly called upon.  Horne incorporates the "The Wrath of Grace" fully herein.

Horne was not really disciplined or terminated for these alleged safety concerns.  Why not?  Because the evidence shows below that Horne's peers <u>and</u> managers had just as many vehicular accidents as Horne and in some cases **more**; they were not disciplined or discharged like Horne!


**What's good for the goose is evidently NOT good for the gander**

Telling, Grace claims in his deposition that his other subordinates didn't "very often" fail to carry out work assignments satisfactorily.  *Grace pg 129:8-25*.  He seemed to have convenient

amnesia when it came to the shortcomings of his staff except for Horne and before confronted with documentation below.   The following evidence shows otherwise. Based on the page limitations of this Response, the comparators below represent but a **sample** of the infraction history of Horne's peers.   Horne is happy to supplement an exhaustive list should the Court request same.

Corpus Esparza

Esparza is a grounds employee at DISD supervised by Grace and Anderson.   *Grace pg 82: 15-18.*  He does not have a disability.  He **resigned** on August 5, 2011.  *Grace exhibit 14, page 4.*  Esparza had a number of performance deficiencies: (1) a series of excessive absences and needs to improve on details when mowing.  *Grace exhibit 16, page 1, 2, 5, 6, 11, 13, 15, 16, 17, 21, 22 (2)* on May 1, 2002, it was noted that he had 21 absences, needed to "Improve on attendance" and "Be more cooperative with fellow workers." *Grace exhibit 16, page 19 and 20; (3)* On January 12, 2006, he had a workplace injury; (4) On July 10, 2006 – some six months later, he had another workplace injury; (5) On November 5, 2010, he had his third workplace injury; (6) On October 18, 2006, his peers asked him not to use his dirty hands to get ice from the group's water cooler.   Esparza disregarded the request of the team and grabbed ice from the group's water cooler with his dirty hands contaminating the water for the group.   It was noted that this was not Esparza's first time disrespecting his peers. "Corpus has contaminated the drinking water on **several** occasions before. This disrespectful behavior needs to end." *Grace exhibit 16, page 27(emphasis added);* Interestingly, Grace wrote this <u>after</u> Horne was terminated and despite Esparza having long-standing prior issues; *(7)* on November 20, 2006, he backed[11] a DISD vehicle into the dump trailer being pulled by another DISD vehicle causing property

damage. *Grace exhibit 16, page 28.* **Esparza was not written up for his November 20, 2006 workplace accident**; *(8)* on June 22, 2010, he operated a riding mower with the chute up in direct violation of the safety manual. *Grace exhibit 16, page 26; (9)* on June 9, 2011, he failed to secure a DISD trailer with a backhoe on it in direct violation of the "law when hauling equipment." The trailer came loose and crushed a diesel tank and blew out the rear windows of a truck cab causing property damage. Joe Elizardo was a passenger in this dangerous incident and thus there was danger to him as well. *Grace exhibit 16, page 29.* **Esparza was not written up for his workplace accident**; (10) On December 15, 2006, Grace observed Esparza at the high school trying to push a wheelbarrow full of rocks through the mud. Grace, Esparza's superior, called his name and asked Esparza to wait for assistance. In response thereto, Esparza deliberately tipped the wheelbarrow over dumping all the rocks and threw his hands in the air in disgust. As if that were not enough, Esparza then walked towards Grace (Esparza's superior) in a threatening manner and asked Grace if Grace "had a problem." Some thirty-four days later, Grace memorialized same in writing but **Esparza was not formally written up for his December 15, 2006 workplace antics.** Interestingly, Grace wrote a "note" <u>after</u> Horne was terminated and despite Esparza having long-standing prior issues; (11) On August 13, 2008, he backed[12] up a DISD trailer with the cage door down and broke a tail light causing property damage. **Esparza was not written up for his August 13, 2008 workplace accident**; (12) On November 18, 2005, he was issued a write up which succeeded two prior warnings on February 7, 2005 and June 7, 2005. There are no write-ups for events occurring on February 7 and June 7,

---

[12] Remember, Grace claimed that the rule was "…when you're backing up, you always used your mirrors if you're by yourself…If you have someone with you, you always have that person get out and…guide you…" *Grace 51: 11-17 and 52:23 through 53:9.*

2005.  Nevertheless on November 18 of that same year, Esparza's superior asked him to move a DISD truck out of the circle in front of the elementary school, which Esparza refused. As if that were not enough, Esparza's superiors asked him to trim trees with a certain employee.  Esparza once again refused this specific assignment; (13) "he has started yelling at a couple of guys, and then I confronted him and he started yelling at me…" *Grace pg 135:9-14*.  Grace was Esparza's immediate supervisor; (14) he "put the wrong fuel in a fuel can also." *Grace pg 143:19-20*; and (15) he had difficulties following directions. *Anderson pg 137:7-9.*

<u>Matthew Montes</u>

Grace claims Montes was the model employee.  *Grace pg. 140:2-5*.  Montes is a grounds employee at DISD.  He does not have a disability.  He was hired on August 4, 2004 and was **<u>not terminated.</u>**  *Grace exhibit 14, page 4*.  Montes had a number of performance deficiencies: (1) per an October 16, 2006 (Grace, who resigned in 2008, was Montes' supervisor) write-up, he missed 24.25 days in one year. *Grace exhibit 14, page 1*; (2) he lost a DISD hand-held radio on November 6, 2006 (Grace, who resigned in 2008, was Montes' supervisor) costing DISD more than $400.  *Grace exhibit 14, page 2*; (3) he used the car wash facility at DISD to clean his personal vehicle on December 4, 2007 (Grace, who resigned in 2008, was Montes' supervisor) *Grace exhibit 14, page 3*; (4) he had a vehicular accident on June 4, 2008 in a DISD vehicle. *Grace exhibit 14, page 4*.  **Montes was not written up for his June 4, 2008 workplace accident**; (5) he failed to use protective gear while spraying pre-emergent on the grounds causing chemicals to fly in his face and mouth on February 16, 2006.  This occurred on a Thursday at 9:00 a.m. at K.E. Little Elementary School at a time when small children were at school.  **Montes was not written up for his failure to wear protective gear while using harmful chemicals!** *Grace*

*exhibit 14, page 5*; (6) he was observed speeding[13] through the bus drive at the high school at 2:35 p.m. in DISD vehicle #225. Despite the "safety concerns related to speeding through a school parking lot," **Montes was not written up!** *Grace exhibit 15;* (7) On July 30, 2007, he was **yet again** speeding "at over 80 miles per hour while operating vehicle #126." Montes admitted same. DISD's records state very clearly "**No disciplinary action was taken.**" *Grace exhibit 15;* (8) On December 7, 2009, Montes was observed by a taxpayer at a local convenience store on DISD time playing the lottery and hanging around the store. Montes blocked the gas pumps with DISD vehicle #227 preventing others from getting gas. Montes admitted same. **Montes was not written up!** *Grace exhibit 15;* and (9) On February 4, 2010, Montes was "talked" to about excessive absences over a 5 month period – some 17.5 absences and 6 times leaving work early. **Montes was not written up!** *Grace exhibit 15.*

Steven Muecke

Muecke is a grounds employee at DISD supervised by Grace and Anderson. *Anderson pg 95:21 through pg 96:9.* He does not have a disability. He was hired on January 14, 2009 and was **not terminated.** *Anderson exhibit 22, page 2.* Muecke had a number of performance deficiencies very early into his career at DISD: (1) On August 19, 2009 (7 month old employee), he hit his personal car while driving a DISD vehicle resulting in property damage. *Anderson exhibit 22, page 1*; and (2) On June 8, 2009 (5 month old employee), he rear-ended a third party's car while driving a DISD vehicle resulting in property damage. *Anderson exhibit 22, page 2.*

**Muecke was not written up!**

Jeff Jones

---

[13] This is both a DISD violation <u>and</u> municipal violation. Speeding is a danger to all this employee encountered both in DISD vehicle #225 and again in #126.

Jones is a grounds employee at DISD.  *Anderson pg 104:14-15.*  He does not have a disability.  He voluntarily **resigned.**  *Anderson exhibit 22, page 2 and Anderson pg 103:5-11.*  Jones had a number of performance deficiencies.  According to Anderson, Jones damaged a number of DISD property including vehicles, grounds equipment and mower.  *Anderson pg 103:18-21.*   (1) On October 23, 2009, he "was backing up truck #228 with trailer [in DISD parking lot] and damaged right side tail light" resulting in property damage; further, this was the "3rd damage to district property (2nd vehicle damage)." *Anderson exhibit 23, page 1*; (2) On July 23, 2008 and as per the October 23, 2009 write-up, he had an issue but **there is no write-up for it;** *Anderson exhibit 23, page 1*; (3) on June 16, 2009 and as per the October 23, 2009 write-up, he had an issue but **there is no write-up for it**. *Anderson exhibit 23, page 1.*   and (4) he had difficulties following directions. *Anderson pg 137:20-24.*

Dave Grace

Surprise!  Surprise!  Dave Grace himself had a "dangerous" driving record while in DISD vehicles. *Grace pg 114:18-22.*  Grace, Horne's supervisor and the one who concluded Horne was "dangerous," had not one, not two, not three but four (4) accidents in a DISD[14] vehicle. *Grace pg 114:18-22.*  (Henry did not write Grace up for such.  *Grace pg 115:18-19.*)  (Anderson did not write Grace up for such though there was property damage.  *Grace pg 117: 5-16*)(Anderson did not write Grace up for such though he backed into someone resulting in property damage.  *Grace pg 118:5-25*)(Anderson did not write Grace up for such though he scraped a pickup truck with another truck resulting in property damage.  *Grace pg 119:23 through 120:17.* "…I just should have been more careful." *Grace pg 121:3-4.*)  He does not have a learning or mental disability.

---

[14] Grace also had three vehicular accidents outside of work though a DISD employee.  Grace pg

21

*Grace pg 94:16-20.* Grace was never disciplined for his four vehicular accidents.  Grace was evaluated as performing well.

The take-away is that DISD did not take seriously vehicular accidents – except when it came to Horne. This is harassment; Horne was singled out because of his disability.  This is motive; Management wanted to get rid of Horne because of his disability and the responsibilities that flowed therefrom.  This is pretext to any claim that Horne was disciplined and terminated for legitimate business reasons.  Moreover, DISD would have the Court believe that Horne can only compare his alleged infractions to his peers on an "absolutely identical" basis and not "nearly identical."  The Courts simply look at whether "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Crosby v. Computer Sci. Corp., 2012 U.S. App. LEXIS 8853 (5th Cir. Miss. May 1, 2012).* Horne was fired allegedly because of safety reasons.  According to Grace, "there seemed to have been quite a few vehicle accidents." *Grace pg 87:14-22.*  Horne had three accidents in 10 years.  That is 1 accident every 3.33 years. His peers had more accidents in a shorter period of time and were not treated the same as Horne. Grace, himself, had more vehicular accidents at DISD.  No other employee was terminated by Anderson for vehicular accidents – save for Horne.  *Anderson pg 43: 13-15, 19-24.* Anderson could not recall ever terminating an employee for safety reasons – save for Horne. Too and despite the violation history (e.g., accidents, speeding, attendance, failure to follow instructions, and flagrant insubordination) of Horne's subordinates as outlined above, Grace never called these employees "stupid."

2.      **TAKS test materials**

---

121:17-24.

On April 18, 2006, Horne was disciplined for allegedly failing to deliver TAKS test materials to a DISD. *Grace exhibit 7.* The person responsible for loading the test materials onto the truck, not Horne, failed to do so. *Horne pg 142:8-10 and 145:12-15.* Importantly, only Horne was written up for this matter. *Grace pg 146:24 through 147:5 and Anderson pg 147:1-4.* If the goal in providing a disciplinary action was to sincerely hold accountable responsible persons, Horne would not have been written up or Horne would not have been written up alone. Instead, the goal was to lay a paper trail[15] that could be used to justify Horne's termination. The end result: the test materials were found and properly delivered before test day.

**3.      Lost Keys**

On April 17, 2006, Grace wrote Anderson asserting that Horne had misplaced some keys for truck #171. *Grace exhibit 8.* It should be noted that Horne thought he returned the keys to the proper location. *Horne pg 134:4-10.* And there is no proof Horne lost those keys.

Misplacing keys at DISD was common. Horne knew of others who lost DISD keys. *Horne pg 136:8-25.* If Horne was disciplined for allegedly misplacing keys "then there should be a bunch of people… Because we were making keys all the time for a lot of missing keys." *Stutts pg 47:8-14.* Anderson recalls "not more than five" occasions where his subordinates lost DISD keys. *Anderson pg 142:17 through pg 144:13.* These employees were not treated inhumanely like Horne.

**4.      Failure to follow instructions**

On August 23, 2006, Horne was written up for allegedly not completing an assignment.

---

[15] Stutts is a first-hand witness to DISD's modus operandi of singling out an employee and creating a dossier of complaints on said employee. "They wanted to get rid of this person, but they needed to have proof to get rid of this person." *Stutts pg 37:8-11.*

*Grace exhibit 11.*  Horne was to move furniture at the high school.  *Grace exhibit 11.*  Horne did not move said furniture because he received another assignment that took him away from the high school.

Horne was not the only employee who failed to follow instructions.  Horne was, however, the only one with a learning disability and who was subjected to consequential disciplinary action.  According to Stutts, "a lot of times" other grounds employees "didn't get the order over the radio."  *Stutts pg 18:14-25.*  These employees were not treated inhumanely like Horne.  See the disciplinary history of Esparza and Jones on "What's good for the goose is evidently NOT good for the gander" section above. *Anderson pg 137:7-9 and Anderson pg 137:20-24.*

## Termination Day

Importantly on the day Horne was terminated, Anderson was over several different units in the maintenance department: grounds, air conditioning, electrical, plumbing, audiovisual, carpentry and warehouse. *Anderson pg 36: 1-18.*  Neither Anderson nor Grace ever considered Horne for work in another maintenance department aside from grounds, which is a denial of ADA accommodations. *Anderson pg 162:15-17 and Grace pg 128:3-11 and pg 161:18-21.* Horne had air conditioning experience prior to DISD working for his parents' company.  Why could Horne not continue to work in laundry every August through February especially since there was only one other employee who performed those same duties with Horne before his discharge? *Anderson pg 53:24 through pg 54:4 and 8-14.* And especially why when Anderson admitted there was enough laundry to keep Horne busy during this time.  *Anderson pg 55:3-12.* And especially why when Horne was never disciplined for matters related to his laundry duties.

Four months before Horne was terminated, he rated a "meets expectations" on his performance evaluation and his rating for safety yielded a 3 out of 5. *Anderson exhibit 15*. At his termination, Horne is considered ineligible for re-hire in the maintenance department. *Anderson pg 46:2 through pg 27:1*.

Superintendent Tom Mooney offered Horne a position "picking up trash on the grounds and upkeep at the stadium." *Anderson pg 80:20-22 and Horne pg 205:1-9*. The truth is that was no "position" at all. The "position" did not exist and was never created. Moreover, the "position" could be said to be degrading. It was going to be **less** than part-time – just whenever Horne "was needed." *Horne pg 205:1-9*. Even Anderson admitted to not finding desirable the thought of being down-graded from full-time to part-time employment. *Anderson pg 170:16-20*. Too, the pay was significantly lower than Horne's pay in the grounds department. *Horne pg 205:1-9*. It is untrue that Horne rejected this "offer" because it was not full-time. Horne refused this "offer" because it was not a firm position (it had not been created yet and was never created), paid significantly less than his regular pay, and meant he would be on-call[16] whenever he was needed thus preventing Horne the freedom of looking for comparable work.

Finally, Grace claims that Horne was such a dangerous employee. *Grace pg 87:14-22*. Nevertheless, Grace claims that he told Horne he **would** (as in sometime in the future) ask his wife, a Wal-mart employee, if there were job opportunities at it.[17] *Grace pg 89:13-24*. Who

---

[16] It was never communicated to Horne that this "position" -- when created -- would require a commitment of 2-3 days a week. Nor is the following true as per DISD, "Horne testified that he did not ask anyone at DISD if there were any full-time jobs available at that time, although he knew there were no such jobs." *Motion at pg 9*. Horne would have no idea the full extent of available jobs at DISD. Too, Horne stated very clearly that he did not think Grace (and Anderson) wanted him working at DISD. And Grace and Anderson admitted they did not want Horne working in maintenance.

[17] There was no firm job offer from Wal-mart to Horne. Grace pg 160:17 through pg 161:1.

would risk his reputation to get an employee hired at Wal-Mart if he truly believed that employee was a safety hazard? Too, Grace admits that he had not confirmed a position at Wal-Mart for Horne at the time Horne was terminated or anytime thereafter. Whether or not Grace sincerely intended on helping Horne find employment at Wal-Mart is debatable especially considering how strongly he felt about Horne. A jury is free to disbelieve Grace.

DISD's discipline and termination of Horne, especially when compared to his peers, was simply a form of disability-based harassment, evidence of its motives towards Horne and pretext for the real reason it took such adverse actions against Horne – his disability.

### III. <u>Statement of the Issues and Standard of Review</u>

*Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097 (2000) makes clear the well-settled doctrine that the summary judgment record must be reviewed in the light most favorable to the employee/non-movant; that all reasonable inferences are to be resolved in the employee's favor; and that the District Court is not to make credibility determinations, weigh the evidence, or draw legitimate inferences from the facts, as that is the province of a jury. *Reeves*, 120 S.Ct. at 2110 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

### IV. <u>Arguments and Authorities</u>

**DISD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISABILITY DISCRIMINATION CLAIMS**

The ADA is a federal anti-discrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to individuals without disabilities. 29 C.F.R. § 1630, App. (1996).

---

Moreover and with all due respect to Wal-Mart employment, a jury could find that Grace's reference to a job at Wal-Mart was meant to be condescending.

A Title I plaintiff must show that (1)[18] he is disabled (in at least one of the three ways defined below); (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees." *McInnis v. Alamo Cmty. Coll. Dist.,* 207 F.3d 276, 279 (5th Cir. 2000).

A.    Plaintiff's *prima facie* case of disability discrimination.

### 1.    Kenneth Horne was disabled under <u>all</u> three definitions

"As a threshold requirement in an ADA[19] claim, the plaintiff must ... establish that he has a disability." *Rogers v. Int'l Marine Terminals,* 87 F.3d 755, 758 (5th Cir.1996). The ADA defines a disabled person as an individual who: (i) has a physical or mental impairment that substantially limits one or more major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment. 42 USC §12102(2). A plaintiff is not limited to pleading just one of the three parts of the definition, as Courts have recognized that the facts can very well fit into more than one definition. *Bragdon v. Abbott,* 524 U.S. 624 (1998).

Most assuredly, Horne fits into all three categories of 'disability.'

1. Actual Disability ~ a physical or mental impairment that substantially limits one or more major life activities

Whether an impairment is substantially limiting depends on (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact." *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.,* 242

---

[18] DISD only challenges whether or not Plaintiff was disabled within the meaning of the ADA.
[19] "The ADA Amendments Act of 2008 is principally aimed at reversing Supreme Court precedent perceived as improperly narrowing the scope of protection originally intended by drafters of the ADA." *Garner v. Chevron Phillips Chemical Co., L.P., et al.,* H-10-138 pg 10 (S.D. Tex. 2011)(Hon. Melinda Harmon).

F.3d 610, 614 (5th Cir.2001).

Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995) (quoting 29 C.F.R. § 1630.2(I))(emphasis added). "The central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 185 (2002). For the major life activity of taking care of oneself, an inability by the plaintiff to complete tasks of daily living, "by herself or in the amount of time an average person would require supports a reasonable inference that she was substantially limited in caring for herself."*EEOC v. Chevron Phillips Chemical Co.,* 570 F.3d 606,617 (5th Cir.2009).

Horne is learning disabled and has been all of his life. *See "Meet Kenny."* As a result, Horne cannot, without assistance largely parental, take care of himself (e.g., 1~pay bills especially complicated ones with offsets, adjustments, and the like; his parents assist him still to ensure accuracy to complete the bill paying process; 2~handle adult matters without overwhelming assistance especially obtain health insurance, fill out job applications, etc. to complete the process; 3~properly handle his nutrition to complete the process of healthy eating; left to his own devices, Horne would eat only snacks in a child-like fashion; and more.).  Horne cannot learn because he cannot process well. (e.g., his vocabulary is limited. His speech is limited. He repeats things in an effort to comprehend it. His ability to receive, process and carry out instructions is limited. Consequently, he has trouble using certain skills like reasoning and applying.) And, Horne cannot work as affirmed by DISD's very own admissions! DISD: (1) openly acknowledged "…accommodat[ing] [Plaintiff] for years **in conformance with the Americans with Disabilities**

**Act.** *Exhibit F, page 1, par 2 (emphasis added);* (2) admitted to understanding "Kenny's circumstance" per Anderson in a <u>recorded</u> post-termination meeting with Susan Wilcox, Kenny and the Hornes *Exhibit G*; (3) *a*dmitted that Horne spoke slowly as compared to others. *Anderson pg 176:3-5;* (4) admitted that Horne was slow at following directions as compared to others. *Anderson pg 176:2;* (5) admitted that Horne "repeats things to you." *Anderson pg 176:13.* In fact during Horne's deposition, he would often repeat his attorney's objections. [(Attorney)Katrina Patrick: Objection, form. Horne: Objection, form. *Horne 12:7-8; 12:21-22 and 14:2-3];* (6) proclaimed "There are very **few** things that [Horne] can do"; (7) opined that Horne "didn't use common sense";  (8) concluded Horne needed work "with simpler tasks"; (9) considered him "stupid"; (10) compared him to "Forrest Gump"; (11) gave him degrading tasks like cleaning toilets; and (12) firmly believed "we are carrying him."

Horne's need for additional time and need for help in completing the aforementioned tasks demonstrate a substantial limitation. This record is replete with evidence that Horne cannot do many of the self-care, learning, thinking tasks that healthy unimpaired adults do so quickly and so accurately as to go almost unnoticed. If you cannot complete a job application, you cannot work.  If you cannot comprehend eating properly, you cannot take care of yourself.

Horne's medical condition can be distinguished from those cited by DISD. In *Richard v. Dupont,* the plaintiff's own physician testified that she was not disabled as a result of her depression. Nor did the physician suggest that Plaintiff seek workplace accommodations. *395 Fed. App'x 168, 169 (5th Cir.2010).*  Plaintiff put on no evidence that she needed assistance in performing tasks.

Here, DISD's own managers recognized Horne's learning disabilities.  Here, DISD's own

managers recognized that there were tasks that Horne simply could not do. Here, DISD's own managers – particularly Henry -- accommodated Horne's learning shortcomings. But after Henry, the accommodations ceased. Here, Plaintiff, his mother, Stutts, Henry, Anderson and Grace all aver that Horne needed assistance in performing basic tasks.

2.  History or Record of Disability

Although the ADA does not define "record of impairment," the regulations provide that it means the plaintiff has a history of, **or has been misclassified** as having, a mental or physical impairment that substantially limits one or more of the major life activities.  *29 C.F.R. 1630.2(k)(emphasis added)*; *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1120 (5th Cir. 1998); and *Avina v. Dallas ISD*, 1999 U.S. Dist. LEXIS 6946 at *13 (5th Cir. April 30, 1999). A record of a disability may be **<u>any</u>** form of record, such as a hospital record, medical record or any other document that indicates the plaintiff once had a substantially limiting impairment.  *School Board of Nassau County, Fla. V. Airline,* 480 U.S. 273 (1987)(production of evidence of hospitalization is sufficient to establish a record of a disability)(emphasis added).

Horne was hired by DISD under the Americans With Disabilities Act.  Henry declared so. *Stutts pg 79:13-14.* Stutts witnessed so. Stutts personally observed a document in Horne's personnel file referencing same. *Stutts pg 14:12-19 and pg 80:1-20.* DISD's agents confessed so during the administrative phase at the EEOC. DISD openly acknowledged "…accommodat[ing] [Plaintiff] for years in conformance with the Americans with Disabilities Act" in correspondence with the EEOC.  *Exhibit F, page 1, par 2.* Horne's personnel records are sufficient to establish a record of his disability. Horne either had a history of an actual disability or was misclassified as having an actual disability dating back to his hire in 1996.

Beginning in the third grade and until graduation, Horne attended all special education courses at DISD. Grace even admits to having learned that Horne was a special education student at DISD from Stutts. *Grace pg 84:5-10*. Horne told Grace as much in 1998, "I told him I was in special classes that I took and I had learning disability and I was slow at catching on to things." *Horne pg 80:2-10*. Horne's school records, which were common knowledge to his DISD managers, are sufficient to establish a record of his disability. Horne either had a history of an actual disability or was misclassified as having an actual disability.

Anderson and Grace were even told of Horne's learning disability. Horne's medical records are sufficient to establish a record of his disability. Horne either had a history of an actual disability or has been misclassified as having an actual disability.

3. Perceived or Regarded as Disability

Under the ADA, a plaintiff is "regarded as" disabled if he: "(1) has an impairment which is not substantially limiting but which the employer perceives as ... substantially limiting ...; (2) has an impairment which is substantially limiting only because of the attitudes of others towards such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment." *Rodriguez v. ConAgra Grocery Prods. Co.,* 436 F.3d 468, 475 (5th Cir.2006). The employer "must entertain some misperception regarding the individual-either that he has a substantially limiting impairment that he does not have or the impairment is not so limiting as believed." *Aldrup v. Caldera,* 274 F.3d 282, 287 (5th Cir.2001). Under the "regarded as" prong, the disability status depends on how the plaintiff was perceived and treated by those individuals alleged to have taken discriminatory action. *Deas v. River West, L.P., 152* [*14] *F.3d 471, 476, n.9 (5th Cir. 1998)*, cert. filed, *67 U.S.L.W. 3394*, No. 98-916 (December 2, 1998), and

*67 U.S.L.W. 3438*, No. 98-1057 (December 30, 1998).

In *Avina v. Dallas ISD*, the Court held that the Plaintiff was not "regarded as" disabled because he received a promotion to a higher grade custodian. *Avina v. Dallas ISD*, 1999 U.S. Dist. LEXIS 6946 at *14 (5th Cir. April 30, 1999). Based thereon, the court reasoned that Avina "obviously" was not perceived and treated as being impaired to a substantially limiting extent. *Id.*

Here, it is obvious DISD thought otherwise of Horne.

Anderson and Grace's never-ending comments and deeds are indicative of their strong perceptions of Horne – that: Horne could not work period. Horne could not function period. Horne was useless. DISD certainly believed –right or wrong- that Horne could not perform very broad jobs.

Both Anderson and Grace regarded Horne as unable to perform a **broad** range of jobs. Anderson was over several different units in the maintenance department: grounds, air conditioning, electrical, plumbing, audiovisual, carpentry and warehouse. *Anderson pg 36: 1-18.* Notwithstanding, Anderson failed to consider Horne for any positions in any of these varied departments.  This is a classic case of being regarded as unable to work in a **broad** range of jobs. There is nothing narrow about the aforementioned: grounds, air conditioning, electrical, plumbing, audiovisual, carpentry and warehouse work.  It is absolutely untrue that Anderson sought to find Horne jobs in other departments; a jury is free to disbelieve same.  Anderson and Grace's own testimony refutes as much.  *Anderson pg 162:15-17 and Grace pg 128:3-11 and pg 161:18-21.*

Grace proclaimed "There are very **few** things that [Horne] can do." Grace opined that Horne "didn't use common sense." Grace maintained that Horne needed work "with simpler

tasks." Grace sighed incessantly at Horne repeating instructions back to him.  Grace sighed

incessantly at Horne's request that Grace repeat instructions back to him. Grace refused to repeat

work instructions back to Horne.  Grace refused to allow Horne to repeat work instructions back

to him.  Grace would snap back at Horne, "I've already told you what to do."  Grace openly

called Horne "stupid" at the workplace. Horne was given undesirable assignments such as

cleaning toilets unlike his peers. Grace stated, "I feel that we are carrying him."  All of the

aforementioned –standing alone-is **broad.**

## DISD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT DISABILITY DISCRIMINATION CLAIMS

To establish a prima facie case of hostile work environment, an employee must show that

(1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the

harassment was based on the employee's membership in the protected group; (4) the harassment

affected a term, condition, or privilege of his employment; and (5) the employer knew or should

have known of the harassment in question and failed to take prompt remedial action.  *Celestine v.*

*Petroleous de Venez,* 266 F.3d 343, 353 (5th Cir. 2001).  A plaintiff need not establish the fifth

element if the alleged harasser is a supervisor with immediate or higher authority over the

employees.  *Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir.1999).

In determining whether a working environment is hostile, courts consider the following

"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance."  *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993).

Horne was a disabled employee with learning challenges.

Horne was subjected to unwelcome, disability-based harassment as stated in the Facts

33

section above.  In particular: (1) Horne worked without incident until Cecil Henry retired and Dave Grace and Jimmy Anderson began supervising him directly. Thereafter, he was written up quite often with disability-based hostilities spewed at him; had to endure disciplinary sessions with both Anderson and Grace disability-based hostilities; and appreciated the fact that his peers were not written up for same (*Horne pg 142:8-10 and 145:12-15); (2)* Horne's managers exhibited no patience with him.  Grace admitted in his deposition to being "mad" at Horne on several occasions.  Stutts testified that Grace would ignore Horne or sigh or snap back at Horne "I've already told you what to do."  (*Stutts pg 19:11-22. Stutts pg 19:18* through *pg 20:5*). Stutts never heard Grace take this same, crass position with his other subordinates -- only Horne.  *Stutts pg 20:16-19.* Grace even admitted to not having such hostile feelings about his other subordinates, though the evidence shows that Horne's peers also had vehicular accidents, lost keys, and did not follow instructions. Importantly, this toxic attitude date back more than three years prior to Horne's termination.  Horne had to endure same for much too long; (3) Horne was openly ridiculed, called "stupid," referred to as "Forrest Gump[20]" by Esparza on several occasions and by Botello; and more.  Importantly, these highly offensive remarks date back more than three years prior to Horne's termination.  Horne had to endure same for much too long.  No other employee was called "stupid" or "Forrest Gump"; (4) Horne was given additional (e.g., driving), challenging (e.g., multiple assignments; conflicting assignments from different supervisors; assignments that he was not able to repeat, have repeated to him or have reduced to writing; and changed assignments midway) and undesirable (e.g., cleaning toilets) work assignments for the express

---

[20] DISD **grossly** misstates Stutts and Horne's reaction to Horne being called "Forrest Gump." Stutts considered Esparza's referral of Horne as "Forrest Gump" to be "terrible." Stutts pg 57:16-25. Horne found it be "inappropriate." Horne pg 199:1-8.

34

purpose of sabotaging and humiliating Horne; (5) Horne was held him to different workplace rules and standards as compared to his peers (See "What's good for the goose is evidently NOT good for the gander" section above; (6) refused accommodations once given by Henry; (7) discharged Horne in October of 2006; and (8) took advantage of Horne's fragile intelligence by warning Horne not to tell anyone he was terminated. *Exhibit A, par 2.* In sum, Grace wanted to get rid of Horne. Grace admitted as much. Grace was tired of repeating instructions to Horne or having Horne repeat instructions back to him. Grace admitted as much. Grace and Anderson disciplined and terminated Horne for reasons they did not also discipline and terminate his peers. The motivation was to get rid of Horne because of his intellectual shortcomings.

The harassment affected a term, condition or privilege of his work. Horne was denied workplace accommodations and thus doomed for failure; subjected to meritless and/or unevenly enforced disciplinary actions and thus doomed for termination; humiliated at work by management – oft times in front of his peers thus devalued and discouraged; humiliated by his peers and thus robbed of dignity; terminated and thus robbed of dignity and income; and denied an opportunity to internally grieve his termination and write-ups. *Wilcox pg 27:15-25 and pg 31:14 through pg 32:4.* On write-ups, an employee is given the opportunity to check a box stating whether they agree or disagree with the contents of the write-up. Horne was never given that opportunity. *Horne pg 139:2-13.* Anderson checked the box "agree" under "Employee Statement" for Horne. *Anderson exhibit 22(as an example) and Horne pg 139:2-13.* Anderson did not take such liberties with any other employee. *Anderson pg 100:15-17.* And so why Horne? Muecke signed off on the write-up: "agree with District statement." *Anderson exhibit 22, page 1.* Jones signed off on the write-up: "agree with District statement." *Anderson exhibit 23, page 1.* Finally, Horne

35

was told not to tell anyone he was terminated. Therefore he missed the deadline to timely grieve his termination internally.

The illegal conduct was carried out by management with immediate and higher supervisory authority over Horne and Horne's peers.

The conduct was both severe and pervasive. Specifically, the conduct occurred over a long period of time – dating back to when Jan Stutts[21] was a DISD employee and before her retirement in 2003. Importantly, Stutts reported the workers' offensive remarks to Anderson when the degradation "got very – very bad[22]." *Stutts pg 21:10-15*. That was sometime before her retirement in 2003. Too, the conduct was directed towards a person who is particularly vulnerable – a person with a mental disability making his life more challenging than his peers. Horne felt Grace, Anderson and his peers' angst. "[Grace] just didn't have the time or patience." *Horne pg 85:6-8.* "Dave Grace, I feel like he did some to try to discourage me at times. Yeah." *Horne pg 117:5-6. "[Grace]* just didn't like my capability and me asking him questions again and how – or explain something and he got real impatient. And like he didn't want me there. And I had gotten rumors from other people that he was trying to get rid of me." *Horne pg 117:19-23.* Working in an environment where you do not feel welcomed and where management openly admits to wanting to get rid of you is more than convincing of conduct that alters the conditions of your employment and creates an abusive working environment. Moreover, there is a serious

---

[21] Stutts' deposition is not immaterial as DISD asserts in its Motion for Summary Judgment. Stutts' deposition is unfavorable to DISD in that she speaks of vile degradations against Horne by management and Horne's peers that date back to 2003. That testimony should be allowed to prove veracity, motive, habit/routine, severity, knowledge of management to Horne's plight, and pervasiveness, among other things.

[22] Again, Stutts resigned in 2003. By 2003, the ridicule of others towards Horne had reached very concerning levels. Poor Horne; he would have to endure it for 3 more years.

36

fact question regarding the motivation of the pointed name-calling, formal disciplinary actions singling out Horne, manager notes singling out Horne, failure to accommodate Horne, termination of Horne, and cover-up of the termination especially when no other grounds worker experienced any of the same – let alone it in totality.

It is absolutely contrary to well-settled law that Horne's claims of harassment are time-barred.  A plaintiff can rely on a 'continuing violation' theory, if the harassment within the limitations period and the harassment outside the limitations period constituted "a series of related acts" and that "an organized scheme led to and included the present violation*." Pegram v. Honeywell, Inc., 361 F.3d 272, 279 (5th Cir. 2004); Felton v. Polles, 315 F.3d 470, 485 (5th Cir. 2002) (citing Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 352 (5th Cir. 2001)).* According to a bystander, Stutts, the offenses against Horne "got very – very bad."[23]  *Stutts pg 21:10-15*. According to Horne, it continued until his discharge. Moreover, these offenses were committed by the same cast of characters, with the same derogatory theme towards a fragile Horne.

Finally, the fifth circuit has refused to exclude evidence that arguably is unrelated to a plaintiff's protected class.  *EEOC v. WC&M Enters., Inc.,* 496 F.3d 393 (5th Cir.2007)("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used….).

## DISD IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIM

The ADA requires employers to provide "reasonable accommodations to the known

---

[23] Again, Stutts resigned in 2003.  By 2003, the ridicule of others towards Horne had reached very concerning levels. Poor Horne; he would have to endure it for 3 more years.

physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless doing so "would impose an undue hardship" to the employer. 42 U.S.C. §12112(b)(5)(A); Barber v. Nabors Drilling U.S.A., Inc., 130 F.3d 702, 706 (5th Cir.1997). "Reasonable accommodation" may include granting part-time, job restricting, training or modified work schedules, etc. 42 U.S.C. §12111(9). Typically, the employer's obligation to provide a reasonable accommodation is triggered by the employee's request for an accommodation. *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996). The employee does not have to mention the ADA or use the phrase 'reasonable accommodations.' Plain English will suffice. *Chevron Phillips Chemical Co.,* 570 F.3d 606, 621 (5th Cir.2009). Courts, however, recognize the unique problem presented in some mental illness cases which may affect the interactive process.   Some mentally ill employees may not be fully aware of the limitations their condition creates or be able to effectively communicate their needs to an employer. Accordingly, the employer may have an extra duty to explore the employee's condition. The responsibility for fashioning a reasonable accommodation is shared between the employee and the employer through an "interactive process.*"  Cutrera v. Bd. Of Supervisors of La. State Univ.,* 429 F.3d 108, 112 (5th Cir.2005).  Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA. *See Taylor v. Phoenixville School Dist.*, 174 F.3d 142, 1999 U.S. App. LEXIS 6067; *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996).

Grace knew of Horne's disability dating back to 1996.  Anderson knew of Horne's "circumstances" during Stutts' employment. Horne made special requests directly to Grace, for

which Grace did not comply. *Horne pg 164:15-24 and pg 165:7-9.* "I'd tell them to write stuff down to where I can understand it better and so that way it will help me out more better to – you know, to proceed on with the work or whatever it was, you know, if it was, you know, something in the – you know, in the grounds or whatever." *Horne pg 164:15-24.* Plaintiff objects and finds sanctionable DISD's distortion of Horne's testimony.  Horne did **not** say that he "occasionally" asked for written instructions from his managers; that is absolutely untrue! *Mtn pg 21.* Horne did **not** say that Grace and Anderson "always" provided written instructions; that is absolutely untrue. *Mtn pg 21.* Horne specially said that Grace would "not too often" provide written instructions. *Horne pg 165:7-9.*  One is hard pressed to mistake "not too often" with "always." Moreover, Grace admitted to <u>not</u> reducing the work assignments to writing on most every occasion in which Horne was disciplined. *Grace pg 103:1-3 and 17-19; Grace pg 106: 12-18; Grace pg 109:18 through pg 110:3; Grace pg 113:2-11; Grace pg 127:4-6; Grace pg 142: 7-18; Grace pg 145:8-13* ("I don't remember.") and *Grace pg 149:18-22.*

Henry made special requests of Grace on Horne's behalf, for which Grace did not comply. Henry would tell Grace about Horne, "Well, we'll just have to always try to **explain things** to Ken and **work with him** and **try to make sure he understands** what to do."  *Grace pg 34:19-23.emphasis added.*

Stutts made special requests of Grace and Anderson on Horne's behalf, for which they did not comply. *Stutts pg 33:6 through pg 34:7 and 19.* "And I said, you have to understand something.  Horne was taught to do this [repeating things] at a very young age and has done this all his life, and will probably continue doing it, because he needs a clear understanding of what is being asked of him.  **Well, I don't care, he said.  I'm just tired of hearing it [said Grace]."**

*Stutts pg 16:10 through pg 17:7(emphasis added).*Grace refused.

Grace and Anderson did not always, or even primarily, reduce work instructions to writing for Horne.  Grace and Anderson did not always, or even primarily, allow Horne to repeat work instructions back to them.  Grace and Anderson did not always, or even primarily, repeat work instructions back to Horne. Evidence shows this took less than a few minutes to accomplish.

*Nor* did DISD give Horne training on landscaping though Grace identified it as a weakness. *Grace pg 154:3-6. Nor* did DISD ever consider removing driving duties from Horne's job description before August 2006.  *Nor* did DISD ever consider Plaintiff work solely with laundry – his original duties. *Nor* did DISD ever consider Horne work in other positions within the maintenance umbrella including working in the air conditioning department or outside of the maintenance umbrella but within the district.

## V. <u>Objections and Conclusions</u>

Plaintiff objects as speculative DISD's assertion that Esparza could have called Horne "Forrest Gump" based on Horne's hair, etc. *Mtn pg18.* Horne has adduced 'overwhelming' evidence that DISD discriminated against him based on his disability. Therefore, in light of *Reeves*, DISD's Motion for Summary Judgment should be denied and this case allowed to proceed to trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant's Motion for Summary Judgment be denied, and for such other and further relief to which he may be justly entitled.

Respectfully submitted,

**/s/ Katrina S. Patrick**

_____

Katrina S. Patrick
State Bar No. 00797218
Federal Bar No. 22038
Law Offices of Katrina Patrick
530 Lovett Street
Houston, Texas  77006
Telephone:  (713) 796-8218
Facsimile:  (713) 533-9607

**ATTORNEY FOR PLAINTIFF**
**Kenneth Horne**

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of June 2012, this instrument was filed pursuant to the electronic filing protocols applicable in the United States District Court for the Southern District of Texas, Houston Division, and that service will be further made in compliance with said protocols.

**/s/ Katrina S. Patrick**

_____

Katrina S. Patrick

41